UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-224(3) (NEB/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE** |
| v. | |
| ABDIWAHAB AHMED MOHAMUD, | |
| Defendant. | |

The United States of America, by and through its attorneys, Joseph H. Thompson, Acting United States Attorney for the District of Minnesota, and Daniel W. Bobier and Melinda A. Williams, Assistant United States Attorneys, respectfully submits the following consolidated response to the defendant's motions in limine. Dkts. 410, 411.

## I. Mohamud's Motion to Exclude Evidence of Conspiracy Misstates the Law and Should Be Rejected.

Mohamud asks the Court to preclude all conspiracy evidence beyond those acts of which he had actual knowledge. Dkt. 410. Because his request contravenes black letter law, the Court should reject it.

A conspiracy is an agreement or an understanding between two or more persons to accomplish by joint action a criminal or unlawful purpose. *See United States v. Hansen*, 791 F.3d 863, 870–71 (8th Cir. 2015) (discussing jury instructions on the "three essential elements of conspiracy"). Once a conspiracy is established, any acts committed or statements made in furtherance of the conspiracy are admissible as to all other members of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E); *see also*

*United States v. Mickelson*, 378 F.3d 810, 819 (2004) ("Co-conspirator statements are admissible … if the prosecution demonstrates that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the declaration was made during the course of and in furtherance of the conspiracy.").

Nothing constrains the government's presentation at trial to the particular examples of conspiracy set out in the indictment. *United States v. Coleman*, 349 F.3d 1077, 1088 (8th Cir. 2003) ("In a charge of conspiracy, the government is not limited to proof of the overt acts charged in the indictment, and a defendant may be held responsible for any of the acts of the conspiracy.") (cleaned up). Nor is there any limitation under the law on presentation of those acts in furtherance of the conspiracy about which the defendant had no personal involvement or no personal knowledge. On the contrary, "[a] single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions," *United States v. Longs*, 613 F.3d 1174, 1176 (8th Cir. 2010), and the government may introduce evidence of all such activities and transactions, *Bourjaily v. United States*, 483 U.S. 171, 180–81 (1987) (co-conspirator acts are admissible even when defendant was not a part of those acts).

All that is required for the admission of foreseeable conspiratorial acts is that the defendant had "full knowledge of the conspiracy's general purpose and scope." *United States v. Huggans*, 650 F.3d 1210, 1222 (8th Cir. 2011). But when Mohamud says that "activities …lie outside the scope of the conspiracy" until the government establishes that he "had *actual knowledge* of the scope of those activities," he

2

misstates the law. Dkt. 410 at 5 (emphasis in original). Black letter law permits the introduction of any acts in furtherance of the conspiracy that are foreseeable. Foreseeability, though, does not require knowledge. On the contrary, conspiracy evidence is admissible against Mohamud even if he did not know the actors involved.

To be clear, however, Mohamud is alleged to be—and the case evidence will prove that he was—an integral part of this conspiracy. He worked and co-operated S&S Catering, a fake food vendor that was an epicenter of the broader scheme. S&S was in a building on Lake Street, across the block from Safari restaurant, a hub of the food fraud and the location of at least 21 food-program sites. The S&S building also housed the Minnesota Senior Center, Mohamud's adult day care business that also participated as a food site early in the program.

S&S Catering bilked the food program both as a site and as a vendor. As a fake food site, S&S falsely billed the Program over $1.2 million. Then, as a fake food vendor, S&S raked in many millions more on the basis of phony invoices purporting to reflect deliveries of thousands of meals to other fake food sites across the metro area. That included fake vending to the other sites named in the indictment. It also included fake vending to many others, as described below. In total, S&S claimed upwards of $20 million and received $17.4 million as a result of its involvement in the fraud conspiracy.

And it was chiefly Mohamud, from his desk inside S&S, who was responsible for generating the bogus documentation to support the claims of S&S's associated sites. When those site operators needed meal counts, they went to Mohamud. Then,

3

when Mohamud and his conspirators' scheme through S&S succeeded wildly, they used some of their fraud proceeds to buy the building that housed S&S. They then bought the surrounding buildings, too. Mohamud demanded and was given a 20% share of the building ownership in exchange for his critical role in creating the false documents to support the fraud scheme.

These facts and others will make clear at trial that Mohamud knew "the general purpose of the scheme." *Huggans*, 650 F.3d 1222. That general purpose was to defraud the Federal Child Nutrition Program. As Mohamud knew, the scheme's scope involved the participation of bogus site operators, fraudulent document mills, and sponsors (like Feeding Our Future). Mohamud's provable knowledge of the general purpose and scope dooms his objections to the admission of other foreseeable acts.

Finally, Mohamud argues that preemptive exclusion of conspiracy evidence is necessary because, he says, this was a "rimless wheel conspiracy." He envisions S&S as a spoke connected to the hub of Feeding Our Future but unconnected to anything else. That is not so.

S&S worked with Feeding Our Future, first as a site and then as a vendor for other sites. Those other sites are other spokes on the FOF conspiracy. Generally, each site establishes or uses a shell company to apply to the Program though FOF or another sponsor. Each site generally creates its own fake meal count sheets. Many of the sites (including those operated by the defendants named in Mohamud's indictment) shared some of their fake documentation—especially rosters, which they

4

then each submitted to their sponsor(s) for claim reimbursement. (Already, with that interplay between discrete sites, counsel's rimless-wheel theory fails.) Each of those sites uses at least one, but typically many, supposed vendors. Most of the food vendors involved with the charged entities across the broader scheme were bogus companies, often run by friends or family of site operators. S&S was just one such vendor.

    S&S was not simply a vendor for the bogus sites operated by the defendants in the instant indictment. Rather, fraudulent S&S invoices were submitted by all manner of sites in the broader scheme, including, to name a few, Smart Therapy LLC, Midnimo, Intown Child Care Center, Make Childcare, Northside Boxing Club, Somalia American Peace Council, and Early Success Center.

    And often, sites that papered their fraud with S&S Catering invoices used other bogus food vendors, too. Such sites also conspired with and used fraudulent records from: Nasib Bakery (who supplied invoices to, among others, Kawsar Jama (pleaded guilty in Case No. 22-226(6)); Dur Dur Bakery (used by the Midnimo site, though Dur Dur at times acted as a site itself); Shabelle Restaurant/Grocery (used by the Mako Childcare site).

    The food program scheme was not a rimless wheel. It was a web of food site operators, bogus vendors, and multiple sponsors—all of whom were known, or at least foreseeable to, one another. S&S, and Mohamud in particular, was at the core of those cross-hatched relationships. To Mohamud, who acted both as a food site operator and a vendor, all of the above was foreseeable.

5

Still, to be clear, the government does not intend to put on a months-long trial proving up fraud at hundreds of different sites and vendors. The government expects its case in chief to last about a week and a half. To the extent Mohamud believes during that presentation that any particular item of offered evidence is so attenuated from him that it could not have been foreseeable as part of the scheme, he can raise those objections then. The Court will be better positioned then to make specific rulings on specific objections. For now, however, the government submits that the Court should deny Mohamud's motion.

## II. Mohamud's Motion to Limit Expert Testimony Should Be Denied As Moot.

Mohamud moves to exclude non-disclosed expert testimony, all testimony informed by "training and experience," and the use of summary witnesses. Dkt. 411.

The first request should be denied as moot. The government will not elicit expert testimony from non-expert witnesses.

The second request should be denied because it is wrong on the law. Lay witnesses like federal agents can testify based on their training and experience without their testimony morphing in expert opinion. To the extent the government elicits any opinion testimony from agents at trial, it will be lay opinion admissible under Rule 701. If at trial Mohamud believes particular testimony exceeds Rule 701, he can raise those objections then.

Finally, Mohamud's motion asks the Court to limit all law enforcement testimony to "the facts they observed during their investigation." Dkt. 411 at 1. To the extent this request is intended to preclude the government's use of summary

6

witnesses, it should be denied. The Eighth Circuit has approved of summary witnesses. *See, e.g.*, *United States v. Beckman*, 787 F.3d 466, 480–81 (8th Circuit 2015). As it did in the two preceding trials in this scheme, the government intends to call certain federal agents as summary witnesses. This will help streamline the presentation of evidence for the jury and the Court and avoid the alternative in which the government must call a series of dozens of law enforcement agents each to provide their small, respective pieces of this massive, years-long investigation. The Court should permit this, consistent with Eighth Circuit law and the past jury presentations by the government in this scheme.

Dated: October 2, 2025                                  Respectfully submitted,

                                                        JOSEPH H. THOMPSON
                                                        Acting United States Attorney

                                                        */s/Daniel W. Bobier*

                                                BY:     DANIEL W. BOBIER
                                                        MELINDA A. WILLIAMS
                                                        Assistant United States Attorneys